## STATE ex rel. STRAIN, Bank Commissioner, v. WELLS, District Judge, et al.

No. 14354—Opinion Filed Nov. 27, 1923.

Rehearing Denied Feb. 19, 1924.

### 1. Banks and Banking — Assets of Failed Bank—Status of Mortgaged Real Estate.

When the state bank commissioner takes over the assets of an insolvent state bank, and the assets of such bank include real property upon which there is a valid and subsisting mortgage lien duly recorded as provided by law, which mortgage and the notes secured thereby were executed by the holder of the legal title, and such legal title was thereafter conveyed to the bank, which bank became insolvent and was taken over by the bank commissioner, held, the bank commissioner took the property subject to all the prior rights of the holder of the notes and mortgage.

### 2. Same—Right of Mortgagee to Receiver.

Section 4979, Rev. Laws 1910, provides that a receiver may be appointed by the courts of the state, "in an action by a mortgagee for the foreclosure of his mortgage and sale of the mortgaged property, where it appears that the mortgaged property is in danger of being lost, removed or materially injured, or that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt." And this section applies with equal force to the state bank commissioner who has taken the real property of an insolvent bank as to the bank, had the bank remained in a solvent condition, and an action by the mortgagee against the original mortgagor, and the state bank commissioner for the appointment of a receiver to collect rents, and from the proceeds to pay taxes, interest, and insurance for the protection of the mortgagee's interests, is not a suit against the state; the state having no pecuniary interest therein superior to the mortgagee.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Original application by the State, on the relation of Joe H. Strain, Bank Commissioner, against the Hon. A. S. Wells, Judge of the District Court of the Sixteenth Judicial District, and others for a writ of prohibition to prevent the named defendant to appoint a receiver to take charge and collect rents of a bank building. Writ denied.

Geo. F. Short, Atty. Gen., M. W. McKenzie, Asst. Atty. Gen., J. T. McIntosh, and Lon Morris, for complainant.

J. W. Brooks and Stevens & Cline, for respondents.

Opinion by RUTH, C. This is an original application for a writ of prohibition filed by complainants against the respondents by which it is sought to prevent the district court for the Sixteenth judicial district from appointing a receiver to take charge of and collect rents of a certain building in the city of Walters, Cotton county, Okla., a portion of which building has heretofore been occupied by the Oklahoma State Bank of Walters, Okla.

The petition of the complainants alleges substantially as follows:

That one J. A. Wiley filed his petition in the above-named district court against J. A. Bonds and Eugenie Bonds, his wife, Joe Strain, successor in office to Roy Walcott as state bank commissioner of the state of Oklahoma, Oklahoma State Bank of Walters, Okla., a corporation organized under the laws of the state of Oklahoma, for profit, B. S. Coleman, Ida B. Coleman, his wife, R. Peoples, Libbie Gordon, W. L. Brooks, and Joe Strain, alleging that J. A. Bonds executed certain promissory notes aggregating $55,000 to B. S. Coleman, and as security for the payment thereof Bonds executed at the same time a certain mortgage on lands and the building thereon, as set out in the petition; that the mortgage was in the usual form with the usual defeasance clause, and provides:

"In case of default in any of the covenants hereof, the rents and profits of said premises are pledged to the holder hereof [the notes] as additional collateral security for the payment of the moneys herein mentioned, and the holder is entitled to the possession thereof by receiver or otherwise."

The petition further alleges the mortgage provides for payment of taxes, insurance, and interest, but that no insurance is being carried; that taxes and interest are in default; that the mortgage was assigned to Wiley; that defendants have taken possession of the premises, and are collecting rents, approximating $600 per month, and are paying no rent for the banking room used by them.

Plaintiff further alleges that Joe Strain, bank commissioner of the state of Oklahoma, is denying the right of the plaintiff to foreclose his mortgage, on the pretense that the mortgaged property is assets of the bank, and that Joe Strain, bank commissioner, and W. L. Brooks, liquidating officer for such bank, are state officers; that the bank became insolvent and was taken over by the banking commissioner long after the execution of the notes and mortgage; that the act of the defendants abridges plaintiff's privileges and immunities as a

citizen of the United States, in that it is in violation of the Constitution of the United States, by impairing the obligation of contracts, and deprives him of his property without due process of law under the Fourteenth Amendment to the Constitution of the United States, and under the Constitution of the state of Oklahoma. The plaintiff alleges the property will probably be insufficient to pay the principal, interest, taxes, and costs of foreclosure, and prays for the appointment of a receiver to take charge and possession of the premises; to control, rent, and collect rents; to make repairs and pay taxes and insurance: and for foreclosure in the manner authorized by law.

Complainants, after setting forth plaintiff's petition in the district court in detail, alleged they appeared specifically and moved to dismiss "on the ground and for the reason that said petition and suit was in fact a suit against the state of Oklahoma," and the district court had no jurisdiction, as the plaintiff had never obtained permission of the state to sue.

The question presented to this court by the application for the writ of prohibition is: Is this a suit against the state? If it is, there can be no question about the immunity of the state from suits without the state's consent, and the district court would be without jurisdiction. This question has been so definitely settled that citation of authorities is unnecessary. Nor will it serve any useful purpose to set forth the legal history of the creation of the state banking board or the duties of the bank commissioner under our statutes as the same have been set forth and ably discussed in opinions by this court. Commerce Trust Co. v. State, 59 Okla. 15, 157 Pac. 717; Ward v. Okla. State of Atoka, 51 Okla. 193, 151 Pac. 852; Lankford v. Schroeder, 47 Okla. 279, 147 Pac. 1049, L. R. A. 1915F, 623; Lankford, State Bank Commr., v. Okla. Eng. and Ptg. Co., 35 Okla. 404, 130 Pac 278; Bailey v. State, 72 Oklahoma, 179 Pac 615; State ex rel. Short v. Norman, 86 Okla. 36, 206 Pac. 522; First State Bank of Okla. City v. Lee, 65 Okla. 280, 166 Pac. 186, L. R. A. 1918B, 609; Briscoe v. Hamer et al., 50 Okla. 281, 150 Pac. 1101.

The statutes of this state relating to the duties and powers of the bank commissioner necessary to be set forth herein, are as follows:

Section 4133, Comp. Stat. 1921. "Any bank doing business under this chapter may place its affairs and assets under the control of the bank commissioner by posting a notice on its front door as follows: "This bank is in the hands of the state bank commissioner.' The posting of such notice, or the taking possession of any bank by the bank commissioner, shall be sufficient to place all of its assets and property of whatever nature in the possession of the bank commissioner, and shall operate as a bar to any attachment proceedings."

Section 4150, Session Laws of 1923, c. 137, provides:

"A bank may purchase, hold and convey real estate for the following purposes:

"First: Such as shall be necessary for the convenient transaction of its business, including its furniture and fixtures, but which shall not exceed one-third of the paid-in capital, except upon the written approval of the bank commissioner countersigned by the banking board;

"Second: Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its business;

"Third: Such as it shall purchase at sale under judgment, decree, or mortgage foreclosure, under securities held by it; but a bank shall not bid at any such sale, a larger amount than enough to satisfy its debts and costs. Real estate shall be conveyed under the corporate seal of the bank and the hands of its president or vice-president and cashier. No real estate acquired in the cases contemplated in the second and third sub-sections above shall be held for a longer time than five years. It must be sold at a private or public sale within thirty days thereafter."

It appears from the complainant's bill that a fee-simple title to the lands and building thereon set forth in the bill of complaint as vested in W. A. Bonds on December 1, 1920, and on that date W. A. Bonds and Eugenie Bonds, his wife, executed the notes and mortgage referred to, and the holder of the notes and mortgage assigned the same to J. A. Wiley and others for a valuable consideration, and the bank was taken over by the bank commissioner on March 10, 1922, and upon investigation an unrecorded deed was found in the vaults of the bank, wherein W. A. Bonds and Eugenie Bonds had conveyed the legal title to the property to the bank, and upon the strength thereof the bank commissioner rests his claim to possession of the premises to the exclusion of the jurisdiction of the district court to appoint a receiver or entertain the plaintiff's action therein.

All the parties hereto have signed a stipulation wherein it is agreed that W. A. Bonds, joined by his wife, executed the mortgage to Coleman, and the same was recorded on December 13, 1920, and the notes were left at the bank for sale; that J. A. Wiley had the abstract examined, and, upon receiving a favorable report, J. A. Wiley,

fda B. Coleman, Libbie Gordon, and R. Peoples purchased the notes, Wiley taking $20,000 worth of same; that all parties paid full face value for same in cash or its acceptable equivalent; that B. C. Coleman assigned these notes by indorsement "without recourse," and assigned the mortgage to Wiley to the extent of $20,000: that the bank continued to collect the rents of the building and kept a book account, charging itself $150 per month for its banking room, and paid insurance and taxes for the first half of 1922, and interest on the mortgage to December 1, 1921; that Bond was in and about the building as cashier for the bank, and Wiley did not know of any arrangements Bond had about collecting rents; that on March 10, 1922, the bank commissioner took over the bank: ceased to charge anything against the bank for rent of the room; that upon taking charge of the bank the commissioner discovered a deed for the property, executed by Bond, after the mortgage sued on was executed, and Wiley had no notice of such a deed until it was recorded after March 10, 1922; that the bank commissioner is receiving all the rents of the building, and has declared and paid to the depositors of the bank a dividend of 20 per cent., but has not paid the holders of the notes and mortgage any sum upon interest due, nor paid taxes, or kept up the insurance. It is further stipulated for the purposes of this prohibition proceeding that the notes and mortgage of J. A. Wiley, Ida B. Coleman, Libbie Gordon. and R. Peoples are regular and valid claims, and that the purchase and holding of such claims was and is in good faith, and it is further stipulated that the only question submitted to this court for its determination is the jurisdiction of the district court of Cotton county, Okla., to entertain said suit and appoint a receiver.

The only allegations in the complaint upon which the complainant founds his right to the writ of prohibition and oust the district court of jurisdiction is "that complainant is bank commissioner of Oklahoma," and the assets of the insolvent bank include the building in which the banking room is located. While section 4133, Comp. Stat. 1921. supra, provides for the taking over of the assets of an insolvent bank. he does not take the assets unconditionally and is not in the position of a purchaser without notice.

In Bailey v. State, 72 Oklahoma, 179 Pac 615, it is held:

"Where the bank commissioner takes pos session of an insolvent state bank, he is not a purchaser of the assets for value without notice, but takes the notes subject to all claims and defenses that might have been interposed against the bank, had it continued under its corporate management."

In First State Bank of Okla. City v. Lee. 65 Okla. 280, 166 Pac. 186. L. R. A. 1918B, 609, it is held:

"It cannot be contended that the placing of the First State Bank in the hands of the state bank commissioner released it from liability for its contracts. * * * Those having claims against a corporation cannot be deprived of their right to prosecute such claims."

In Briscoe v. Hamer, 50 Okla. 281, 150 Pac. 1101, this court quotes the statute law of this state, and uses the following language:

"Section 303, Rev. Laws 1910, among other things, provides:

"'And the state shall have, for the benefit of the depositors' guaranty fund, a first lien upon the assets of said bank or trust company. * * *'"

"Section 304, Id., provides that the bank commissioner shall take possession of the books, records, and assets of a failed bank, and shall 'collect debts, dues and claims belonging to it.' etc. In this situation of the law it seems to us that the position of the bank commissioner in taking charge and collecting the assets of a failed bank is quite analogous to that of a receiver or trustee in bankruptcy, or of an assignee for the benefit of creditors. As we understand the law, a receiver, an assignee, or a trustee in bankruptcy takes the estate of an insolvent as he finds it, and succeeds to the rights of (the insolvent), and only to such rights as the insolvent had at the time of the adjudication of his insolvency, and under such a situation mutual debts or credits between the estate of the insolvent and a creditor may be set off one against the other. and the balance only be allowed or paid, as the case may be."

This court having held the position of the bank commissioner is quite analogous to a receiver. it is necessary to determine the rights, duties, and privileges of a receiver, and section 523, Comp. Stat. 1921, provides:

Section 523. "When it is admitted, by the pleading or oral examination of a party, that he has in his possession or under his control, any money or other thing capable of delivery, which, being the subject of litigation, is held by him as trustee for another party, or which belongs or is due to another party, the court may order the same to be deposited in court or delivered to such party, with or without security, subject to the further direction of the court." .

And this court held in Lawson, Receiver, v. Warren, 34 Okla. 94, 124 Pac. 46, 42 L.

R. A. (N. S.) 183, Ann. Cas. 1914C, 139:

"A receiver holds the property coming into his hands by the same right and title as the person for whose property he is receiver, subject to liens, priorities, and equities existing at the time of his appointment."

On page 100, of 34 Okla. (124 Pac. 49) this court further cites with approval, American Trust & Savings Bank v. Gettigan, Receiver, 152 Ind. 582, 52 N. E. 793, 71 Am. St. Rep. 345, as follows:

"It is well established that, when a court takes possession of the property of an insolvent corporation, and appoints a receiver, such receiver 'is the arm of the court,' by which it administers the trust for the benefit of the creditors. But the court receives such property impressed with all existing rights and equities of creditors, and the relative rank of claims, and the standing of liens remains unaffected by a receivership. Every legal and equitable lien upon the property of the corporation is preserved with the power of enforcing it. Gluck v. Becker, Receiver, § 6; 20 Am. & Eng. Enc. of Law, p. 407; Woerishoffer v. North River, etc., Co., 99 N. Y. 398-402, 2 N. E. 407; Hubbard v. Hamilton Bank, 7 Metc. (Mass.) 340; Minchin v. Nat. Bank, 36 N. J. Eq. 436; Snow v. Winslow, 54 Iowa, 200, 6 N. W 191; Hale v. Frost, 99 U. S. 389 (25 L. Ed. 419).

"In Nix v. Ellis, 118 Ga. 345, 45 S. E. 404, 98 Am. St. Rep. 111, the court said: 'As signees, trustees in bankruptcy, and receivers are not purchasers for value, and take the estate of an insolvent subject to all setoffs, liens, and incumbrances in the plight existing at the date to which his title is ultimately referred.' Powers v. Central Bank, 18 Ga. 658; Georgia Seed Co. v. Talmage, 96 Ga. 255, 22 S. E. 1001.

"In Ryder v. Ryder, 19 R. I. 188, 32 Atl. 919, in a suit against a receiver to reform a mortgage given by a firm of which he was appointed receiver, the court said: 'As such receiver he took the property of the partnership, subject to the equity of the complainant to have the mortgage reformed, * * *' and 'in the absence of fraud and of statutory regulations,' he (receiver) takes 'only the debtor's rights, and consequently' is 'affected with all claims, liens, and equities, which would affect the debtor if he * * * were asserting his interest in the property.

"In Miller v. Savage, 60 N. J. Eq. 204, 46 Atl. 632, the court said: 'His (the receiver's) title to the property of the debtor is exactly the same as the title of the debtor himself at the moment when it goes into the receiver's hands'."

The doctrine thus announced by this court is sustained by such a long line of authorities that citation thereof at this time would serve no good purpose, but many may be found cited in Lawson, Receiver, v. Warren, supra.

Under the decisions of this court, unquestionably the bank commissioner occupies a position "in taking charge and collecting the assets of a failed bank quite analogous to that of a receiver," and therefore is subject to the laws governing receivers, to some extent. Many states have created by statute the office of "public administrator," who, by virtue of his office, immediately takes charge of the decedent's estate and administers the same according to law, if it be a case falling within the purview of the statute conferring jurisdiction upon his office. In like manner it may be said the bank commissioner of this state is virtually a "public receiver" for insolvent state banks, with rights, duties, powers, and privileges defined by statute. Section 1, art 14, Constitution of Oklahoma, provides for the creation of a banking department to be under the control of a bank commissioner, and his powers are prescribed, and beyond the powers conferred upon him by legislative enactment he cannot go, and any act of his in excess of the powers so conferred by statute subjects him to the jurisdiction of the courts of the state regardless of his official position.

Certainly it will not be seriously contended the bank commissioner may exceed his statutory powers, and he must be governed by the construction placed upon those statutory powers by this court. Section 4133. Comp. Stat. 1921, provides for the taking possession by the bank commissioner of assets of the insolvent bank; but this court in construing that section (Briscoe v. Hamer, supra) declares his position is quite analogous to a receiver or trustee in bankruptcy, and succeeds only to such rights as the insolvent bank had at the time of the adjudication of insolvency. What rights, then, did Bond, the mortgagor, have, or what rights were possessed by the bank under its unrecorded deed? The mortgage assigned to the holders of these notes for value, before maturity, and without notice is admitted in the stipulation to have been in the regular standard form. This being conceded, the court is not unmindful of the fact that the standard mortgage conveys the legal title to the lands, subject to the defeasance clause providing for payment of the sum secured thereby, together with interest, taxes, insurance, etc. The mortgage and deed executed and filed for record in December, 1920, 15 months prior to the date of the bank being taken over by the bank commissioner,

disclosed W. A. Bonds to be the owner of record and, if Bonds subsequently conveyed his interest to the bank, it could take only such interest as Bonds held, which was, the right to defeat the mortgage by payment of the sums due according to the terms thereof, and the only right acquired by the bank was the equity of redemption conveyed by Bonds. The respondents, Wiley and his associates, having acquired, the notes and mortgage prior to the transfer to the bank and prior to the taking possession of the bank by the bank commissioner, the bank commissioner could stand in no better position than the bank, for, as was held by this court in Lawson, Receiver, v. Warren, supra:

"The receiver stands in the shoes of the Arnold Mercantile Company. His right is not greater than theirs. If the plaintiff had priority as against the Arnold Mercantile Company, he has the same right against the receiver."

And this court quoted with approval the language employed in Nix v. Ellis, 118 Ga. 345, 45 S. E. 404, 96 Am. St. Rep. 111, as follows:

"Receivers are not purchasers for value, and take the estate of the insolvent subject to all set-offs, liens, and incumbrances, and in the plight existing at the date to which his title is ultimately referred."

To the same effect is Bailey v. State, supra. The statutes of this state and the opinions of this court place the right of the mortgagee to have a receiver appointed, beyond question. in certain instances. Section 518, Comp. Stat. 1921 (section 4979, Rev. Laws 1910) provides:

"A receiver may be appointed by the Supreme Court, the district or superior court. or any judge of either, or, in the absence of said judges from the county, by the county judge."

"2nd. In an action by a mortgagee for the foreclosure of his mortgage and sale of the mortgaged property, where it appears that the mortgaged property is in danger of being lost, removed or materially injured, or that the condition of the mortgage has not been performed. and that the property is probably insufficient to discharge the mortgage debt."

In the instant case these conditions exist. The principal and interest are in default: the taxes are unpaid: no insurance is being carried on the building. and, in case of its destruction by tornado or fire, the security would be practically nil. and at present the property is probably insufficient to pay the mortgage debt. This brings it squarely with-

in the statute and the construction placed thereon by this court.

"When mortgagee asks for foreclosure of his mortgage and asks for the appointment of a receiver upon grounds set out in section 4979 of the Revised Laws of Oklahoma 1910, and such grounds being established by the proofs, the mortgagee is entitled to have a receiver appointed as a matter of legal right, and under such circumstances the denial to the mortgagee of a receivership would be a substantial violation of a statutory right possessed by the mortgagee." Skelly Oil Co. v. Globe Oil Co., 82 Okla. 214, 200 Pac. 537.

The rights. duties, and privileges of the parties being clearly defined and definitely determined, we are confronted with the question: Is this an action against the state? If the action in which a receiver is asked is an action against the state, the question is not open for discussion, for it has been well settled that—

"A state, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter." Board of Liquidation of the State of La. & La. Levee Co. v. McComb, 92 U. S. 531, 23 L. Ed. 623.

Complainants in their brief set forth at length sections 276-302-303-304, Rev. Laws 1910, defining the powers and duties of the bank commissioner. Sections 303 and 304 are as follows:

"Sec. 303. Commissioner to Wind up Affairs of Banks. when. Depositors to be Paid, how. In the event that the bank commissioner shall take possession of any bank or trust company which is subject to the provisions of this chapter, the depositors of said bank or trust company shall be paid in full, and when the cash available or that can be made immediately available of said bank or trust company is not sufficient to discharge its obligations to depositors, the said banking board shall draw from the depositors' guaranty fund and from additional assessments, if required, as provided in section 300. the amount necessary to make up the deficiency; and the state shall have, for the benefit of the depositors' guaranty fund, a first lien upon the assets of said bank or trust company. and all liabilities against the stockholders. officers and directors of said bank or trust company and against all other persons, corporations or firms. Such liabilities may be enforced by the state for the benefit of the depositors' guaranty fund.

"Sec. 304. Assets Collected, etc. The bank commissioner shall take possession of the books, records and assets of every description of such bank or trust company,

collect debts, dues and claims belonging to it, and upon order of the district court, or judge thereof, may sell or compound all bad or doubtful debts, and on like order may sell all the real or personal property of such bank or trust company upon such terms as the court or judge thereof may direct, and may, if necessary, pay the debts of such bank or trust company, and enforce the liabilities of the stockholders, officers and directors: Provided, however, that bad or doubtful debts as used in this section shall not include the liability of stockholders, officers or directors."

There is no suggestion in the pleadings that the bank commissioner drew from the depositors' guaranty fund any money to make up any deficiency, and this section gives to the state a first lien upon the assets of the bank to the extent of the deficiency so made up, for the benefit of that fund. The question of the state's right to control the assets of an insolvent bank, when no prior claim or lien exists, is no longer an open question.

"That the bank commissioner and the banking board are a part of the executive branch of the state government, and a suit in mandamus, seeking to compel said officers in their official capacity to allow and pay said claim out of the depositors' guaranty fund, is a suit in effect against the state, and cannot be maintained without the consent of the state." Lovett et al., Creek Co. Com'rs, v. Lankford et al., 47 Okla. 12, 145 Pac. 767.

"A suit against the state bank commissioner to compel him to pay a debt against a failed bank out of the state guaranty fund or out of the assets of such bank in his hands as such officer under the banking law is, in effect, a suit against the state and cannot be maintained without the state's consent." Lankford v. Schroeder, 47 Okla. 279, 147 Pac. 1049, L. R. A. 1915F, 623.

"The title of such depositors' guaranty fund vests in the state just as much so as the common school lands, or the proceeds of the sale of the same, and the taxes levied and collected for the maintenance and support of said schools, all of which are held in trust by the state for a specific purpose." State ex rel. Taylor v. Cockrell, 27 Okla. 630, 112 Pac. 1001; Lankford, Bank Com'r, v. Platte Iron Works Co., 235 U. S. 461, 35 Sup. Ct. 173, 59 L Ed. 316.

These cases are, however, clearly distinguishable from the case at bar, for the reason, these were attempts to compel payment out of the depositors' guaranty fund, or to compel the bank commissioner to issue certificates payable out of such fund, and in State ex rel. Short v. Norman, 86 Okla. 36,

206 Pac. 522, an attempt was made to appoint receivers for the State Bank of Commerce of Okmulgee and to require the bank commissioner to deliver all records, books, money and assets of the insolvent bank to the receivers, and restraining the bank commissioner from further proceeding in the matter of winding up the affairs of the bank; and, while the depositors' guaranty fund is not specifically mentioned, this court held:

"That the law is functioning under the one mode or the other, furnishes no warrant whatever to the district court to interfere with the bank commissioner * * * where he is proceeding as directed by sections 302 and 304, Rev. Laws 1910, to wind up the affairs of a failed bank and to enforce the personal liability of the stockholders, officers, and directors."

In the instant case, there is no effort made to oust the jurisdiction of the bank commissioner from winding up the affairs of the insolvent bank, but solely to protect a prior claimant or lien holder against real property now alleged to be held by the bank. The lands and building in which the bank transacted business had been pledged by the owner thereof Bonds, for the payment of a certain sum evidenced by notes, secured by a mortgage executed at a time when the bank had no interest in the land, and, having been so pledged, the holders of the notes and mortgage have a claim superior to the bank or the bank commissioner.

"The bank commissioner, by virtue of section 303, Rev. Laws 1910, has no lien superior to that of a pledgee upon that portion of the notes of an insolvent bank placed with such pledgee as collateral to an actual loan, necessary to liquidate the indebtedness for which the said collateral was so pledged." Commerce Trust Co. v. State, 59 Okla. 14, 157 Pac. 717.

Such holding by this court is within the letter and spirit of section 10, art. 1, Constitution of the United States:

"No state shall * * * pass any * * * law * * * impairing the obligation of contracts," and section 15, art. 2, of the Constitution of this state, which provides:

"No * * * law * * * impairing the obligation of contracts, shall ever be passed."

The complainant bases his case upon sections 303 and 304, Rev. Laws 1910, providing for the taking over of the assets of an insolvent bank, and giving the state a first lien upon such assets for the benefit of the depositors' guaranty fund, while respondents rely upon the sections of the Constitution above referred to, as well as the Fourteenth

Amendment to the Constitution of the United States, which provides:

"Nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It will not be contended that, when a statute under which an officer claims to be acting is violative of the constitutional provisions hereinbefore set forth, such a statute takes precedence over the Constitution.

"These provisions for the security of the rights of the citizen stand in the Constitution in the same connection and upon the same ground as they regard his liberty and his property. It cannot be denied that both were intended to be enforced by the judiciary as one of the departments of the government established by that Constitution. As we have already said, the writ of habeas corpus has been often used to defend the liberty of the citizen, and even his life, against the assertion of unlawful authority on the part of the executive and the legislative branches of the government. See Ex parte Milligan, 4 Wall. (71 U. S.) 2, 18 L. Ed. 281, and the case of Kilbourn, discharged from the custody of the Sergeant at Arms of the House of Representatives. Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377."

It necessarily follows that, where an officer attempts to act under a statute which in effect deprives the citizen of these rights, the statute must give way to the Constitution. It is not sufficient that the officer suggest that he act under authority of the state, but we must determine whether the authority is lawfully assumed.

In U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171, it is said:

"If this constitutional provision is a sufficient authority for the court to interfere to rescue a prisoner from the hands of those holding him under the asserted authority of the government, what reason is there that the same courts shall not give remedy to the citizen whose property has been seized without due process of law? * * * Looking at the question upon principle, and apart from the authority of adjudged cases, we think it still clearer that this branch of the defense cannot be maintained. It seems to be opposed to all the principles upon which the rights of the citizen, when brought in collision with the acts of the government, must be determined. In such cases there is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime."

The court, in U. S. v. Lee, supra, used the following forceful language:

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law and are bound to obey it. Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also rights in controversy between them and the government; and the docket of this court is crowded with controversies of the latter class. Shall it be said in the face of all this, and of the acknowledged right of the judiciary to decide in proper cases statutes which have been passed by both branches of Congress and approved by the President to be unconstitutional, that the courts cannot give a remedy when the citizen has been deprived of his property by force, his estate seized and converted to the use of the government without lawful authority, without any process of law, and without compensation, because the President has ordered it and his officers are in possession? If such be the law of this country, it sanctions a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights."

Ex parte Edward T. Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, was heard on application for a writ of habeas corpus to secure the release of Young, Attorney General of the state of Minnesota, who has been committed by the Circuit Court of the United States for the District of Minnesota for alleged contempt for disobeying an order enjoining him from instituting certain criminal proceedings under a state statute. Mr. Justice Peckham, delivering the opinion, in denying the writ said:

"A federal court may enjoin the Attorney General of a state, whose general duty is to enforce the state statutes, from proceeding to enforce, against persons affected, a state statute which violates the federal Constitution, such proceeding being not prohibited by the provision of the federal Constitution forbidding the maintenance of actions against a state."

Complainants in their brief have favored us with but one citation from the United States Supreme Court, and, as set forth in the brief, it might be conceded that such opinion gave color to the complainants' claim of immunity from suit.

Complainants' brief advises us as follows:

"We quote from Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L.

Ed. 363, as follows: 'The principle stated by Chief Justice Marshall,' etc."

Then follows what purports to be the opinion of the learned Chief Justice; but an examination of these cases in the original reports discloses the fact that a portion of this language was used by Marshall, C. J., in Osborn v. Bank of U. S., reported in 22 U. S. (9 Wheat.) 738, 6 L. Ed. 204, the opinion being, delivered during the February, 1824, term, and a portion of the language ascribed by complainant to Marshall, C. J., was employed by Mr. Justice Bradley' in Bd. of Liquidation v. McComb, 92 U. S. 531, 23 L. Ed. 623, at the October, 1875, term of the United States Supreme Court, or 51 years thereafter; but, as set forth in the complainants' brief, it is made to appear that the language was employed in the one case by Chief Justice Marshall. and is therefore misleading. Be that as it may in all of those cases, and numerous others, the writ prayed for on behalf of the citizen and against the government was granted. In Pennoyer v. McConnaughy, supra, an injunction was prayed against the Governor, Secretary of State, and State Treasurer of Oregon, comprising the board of land commissioners of Oregon, to prevent them from selling lands claimed by the plaintiff.' on title derived from one Owen. Mr. Justice Lamar in his opinion says:

'This case cannot be distinguished in principle from Osborn v. Bank of United States, Davis v. Gray, Board of Liquidation v. McComb, and Allen v. Baltimore & Ohio Railroad Co. * * * On the faith of a construction thus adopted, rights of property grow up which ought not to be ruthlessly swept aside. unless some great public measure benefit or right is involved, or unless the construction itself is manifestly incorrect. * * *

"Does the statute of 1887 * * * impair such a contract? We think it does, beyond all doubt. It, in so many words, authorizes the board of commissioners to cancel the certificates of sale where the twenty per centum of the purchase price of the land had not been paid prior to January 17, 1879, and treats the land embraced in such certificates as reverted to the state. That legislation surely impaired the obligation of the contract Owen had with the state, for its effect was to destroy valuable property, rights and privileges belonging to him. If was, therefore, violative of the Constitution of the United States. art. 1, § 10."

In Ex parte Young, Petitioner, 209 U. S. 123, 28 Sup. Ct. 411, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, Mr. Justice Peckham says:

" 'But the general doctrine of Osborn v. Bank of U. S. * * * has never been departed from.' The same principle is decided in Scott v. Donald. 165 U. S 58-67, 41 L. Ed. 632, 633, 17 Sup. Ct. Rep. 365. And see Missouri, K. & T. R. Co. v. Missouri R & Warehouse Com'rs, * * * 183 U. S. 53, 46 L. Ed. 78, 22 Sup. Ct. Rep. 18."

In Smythe v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 41 L. Ed. 819, the court said:

"It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of the state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the state within the meaning of the amendment."

Multiplication of cases to the same effect would serve no good purpose, as they may be found cited and collated in the cases herein cited.

The complainants in this case have seized a building in which an insolvent bank was housed, and against which respondents hold a valid and subsisting mortgage executed by W. A. Bonds prior to the taking over of the bank by the bank commissioner. Complainants hold the property, collect the rents; refuse to pay taxes or carry insurance on the building as a protection to the property rights of the respondents, and claim to so hold the property under sections 303 and 304, Rev. Laws 1910, regardless of the opinion of this court in Bailey v. State, supra, that the commissioner takes possession of an insolvent state bank "subject to all claims and defenses that might have been interposed against the bank. had it continued under its corporate management." This being the settled law of this state, it cannot be said that respondents would not be entitled to the relief prayed for, had the bank continued under its corporate management, and the property is subject to such prior claims as the bank would have been. To hold otherwise would destroy the very foundation of our financial system. All legitimate values are based upon or grow out of the land; capital is necessary for the development of agriculture and industrial wealth, and this capital is not obtainable when the security offered for its investment cannot rest upon the solid foundation of our Constitution. The laws of our state (section 4150, Comp. Stat. 1921) provide that a bank may hold real estate (except such as is necessary for the convenient transaction of its business) for a period of five years, and it is not conceivable that capital for development of the state would seek investment where it were possible that a state officer might seize the real estate of an insolvent bank, and retain it for a long period of time, collecting the rents and profits therefrom, refusing to pay taxes, interest, or insurance premiums,

and thus destroy the security pledged for its repayment and destroying the property rights of those holding valid prior claims against the same. To hold that this could be done by the bank commissioner would impair the obligation of a contract, in violation of section 10, art. 1, Constitution of the United States, and section 15, art. 2, Constitution of Oklahoma.

The respondent had, so far as the petition of the complainants discloses, and as embodied in the stipulation herein filed, which stipulation was filed only for the purposes of this action, made and entered into a valid and binding contract with the owner of the real property involved, and was justified in believing those rights would be protected under the Constitution of the United States and this state, and no law enacted by the Legislature or interpreted by an officer of the state might impair the obligation of that contract.

For the reasons herein stated, the writ of prohibition prayed for should be denied.

By the Court: It is so ordered.